1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   VANESSA D. SAVAGE,

11           Plaintiff,                    No. CIV S-07-2747 EFB

12       vs.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,

14
             Defendant.                    ORDER
15   _____ /

16          Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

17   ("Commissioner") denying her application for Supplemental Security Income ("SSI") under

18   Title XVI of the Social Security Act.  For the reasons discussed below, the court grants

19   defendant's motion and denies plaintiff's motion.

20   I.  BACKGROUND

21          Plaintiff formally applied for SSI on July 15, 2007.  Administrative Record ("AR") 50-

22   56.  Plaintiff's application was denied initially and upon reconsideration, and plaintiff requested

23   an administrative hearing.  AR 44-48, 35-39.  On March 22, 2007, a hearing was held before

24   administrative law judge ("ALJ") Theodore T.N. Slocum.  AR 276-318.  Plaintiff was

25   represented by counsel at the hearing, and testified at the hearing, along with vocational expert

26   ("VE") Jim Van Eck.  *Id.*

The ALJ issued a decision on June 22, 2007, finding that plaintiff was not disabled.[1]  AR 11-24.  The ALJ made the following specific findings:

> 1.  The claimant has not engaged in substantial gainful activity since July 15, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

> 2.  The claimant has the following severe impairments: a substance abuse disorder, a bipolar disorder, residuals status post left wrist fracture and left ankle fracture.

> 3.  The claimant substance abuse disorder, standing alone, meet the requirements of Sections 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

> 4.  If the claimant stopped the substance abuse, her remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

> 5.  If the claimant stopped the substance abuse, the claimant would not have an impairment or combination of impairments that meets

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.*  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.*  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits under both programs. *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828, n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

or medically equals any of the impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

6. If the claimant stopped the substance abuse, the claimant would be unable to perform past relevant work (20 CFR 416.965).

7. The claimant was born on April 3, 1966 and was 39 years old, which is defined as a younger individual 18-44, on the date the application was filed (20 CFR 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

9. Per the testimony of the vocational expert, the claimant does not have transferable skills (20 CFR 416.968).

10. If the claimant stopped the substance abuse, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).

11. Because the claimant would not be disabled if she stopped the substance use (20 CFR 416.920(g)), the claimant's substance use disorder(s) is a contributing factor material to the determination of disability (20 CFR 416.935). Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the date the application was filed through the date of this decision.

AR 11-24.

On October 30, 2007, plaintiff requested review by the Appeals Council, and the Appeals Council declined to review the case, leaving the ALJ's decision as the "final decision of the Commissioner of Social Security." AR 4-6.

II. ISSUES PRESENTED

Plaintiff contends that the Commissioner erred in sustaining the ALJ's determination that she is "not disabled" because (1) the ALJ failed to credit the treating and examining opinions of Drs. Behniwal, Globus, and Soliman; (2) the ALJ failed to properly credit plaintiff's testimony/statements and the third party statements of her mother regarding the nature and extent of plaintiff's functional limitations; and (3) the ALJ failed to pose a legally adequate hypothetical to the VE and failed to credit the testimony of the VE in response to the

1   hypothetical which accurately reflected plaintiff's functional limitations.  Dckt. No. 20 at 4.

2   III.  RELEVANT MEDICAL EVIDENCE

3        A.  Consultative Reports

4        Orthopedic Consultative Examination, Gabriel S. Borges, D.O. - September 16, 2004

5        On September 16, 2004, Dr. Gabriel S. Borges, D.O., examined plaintiff.  AR at 143-47.

6   Plaintiff's main complaints were left ankle pain and wrist pain.  *Id.* at 143.  Dr. Borges diagnosed

7   plaintiff with status post left trimalleolar fracture and status post left distal radial fracture, and

8   opined that plaintiff has "some functional limitations due to left ankle findings."  *Id.* at 147.  He

9   stated that he would limit any type of prolonged standing or walking, would limit lifting,

10  carrying, pushing, and pulling to 25 pounds frequently, would avoid climbing on ladders, and

11  would limit squatting to only occasionally, but opined that plaintiff could reach overhead without

12  limitations, use her hands frequently, and bend frequently.  *Id.*  He states that he would refer

13  plaintiff's history of bipolar disease and suicide attempt to mental health.  *Id.*

14       Psychiatrist Examination, Mandeep Behniwal, M.D. - March 25, 2005

15       On March 25, 2005, plaintiff was seen by Dr. Mandeep Behniwal, M.D., for a psychiatric

16  evaluation.  Dr. Behniwal noted that he reviewed medical records from Sacramento County

17  Mental Health.  Plaintiff reported that most of the time she was depressed.  The report reflected

18  that plaintiff "has decreased sleep, does not enjoy things, has hopelessness, decreased energy,

19  and decreased concentration," that she "has some problems with her appetite," that she "has

20  psychomotor retardation," and that she "has made one suicide attempt in the past, when she tried

21  to hang herself in her apartment."  AR at 163.

22       Plaintiff also reported that she felt paranoid and sometimes heard voices.  Her

23  medications were Zyprexa, Depakote, Wellbutrin XL, and Hydroxyzine.  *Id.*  Dr. Behniwal

24  reported that plaintiff was able to socialize with her family but had a very difficult time relating

25  to Dr. Behniwal or the office staff, and Dr. Behniwal described plaintiff's affect as "irritable at

26  times."  *Id.* at 164.  Dr. Behniwal's DSM-IV diagnosis was:

4

Axis I: Mood disorder, not otherwise specified.
Polysubstance dependence, in remission per the claimant.
Axis II: No diagnosis.
Axis III: Sickle Cell Trait.
Axis IV: No major stressors at this time.
Axis V: GAF: 59[2]

*Id.* at 165.

Dr. Behniwal opined that plaintiff had the ability:

to perform simple and repetitive tasks and can perform detailed
and complex tasks also. The claimant can accept instructions from
supervisors, but at this time she would find it moderately difficult
to interact with coworkers and the public. The claimant is irritable.
The claimant will find it mildly difficult [to] perform work
activities on a consistent basis. She will not need any special or
additional supervision.  The claimant might find it mildly
difficult[] to maintain regular attendance in the workplace and
complete a normal workday/workweek, or deal with the usual
stress encountered in competitive work.

*Id.* at 166.

Internal Medicine Consultative Examination, James Martin, M.D. - August 24, 2005

On August 24, 2005, plaintiff was seen by Dr. James Martin regarding her left wrist and
ankle problems.  *Id.* at 229.  On examination, Dr. Martin observed that plaintiff's left wrist range
of motion for the dorsiflexion and palmar flexion was 30 degrees less than normal, the ulnar
deviation was 10 degrees less than normal and the radial deviation was 10 degrees less than
normal.  *Id.* at 230.  He noted that her left ankle range of motion for the dorsiflexion and plantar
flexion was 10 degrees less than normal.  *Id.*  Dr. Martin opined that plaintiff would be able to:

lift not more than 20 lbs. at a time and frequently lift or carry up to
10 lbs.  The claimant can stand and walk, off and on, for at least

_____

[2]  The Global Assessment of Functioning ("GAF") Scale "[c]onsider[s] psychological,
social, and occupational functioning on a hypothetical continuum of mental health-illness." The
American Psychiatric Association's Multiaxial Assessment, set forth in the Diagnostic and
Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th Ed. 2005), at 34.  A GAF of 51-60
indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends,
conflicts with peers or co-workers).

1
2
3

four hours in an eight-hour day. The claimant can sit for six hours
in an eight hour day. Restriction from squatting, walking on grades
and stairs would seem not unreasonable. The claimant appears to
have the ability to grasp, hold and turn objects. The claimant my
have some difficulties with certain fine motor movements which
would require full wrist movement involving the affected hand.

4

5   *Id.* at 231.

6       DDS Physical Residual Functional Capacity Assessment, Sandra Clancey, M.D. -
7   Sept. 8, 2005

8       On September 8, 2005, Dr. Sandra Clancey, a Social Security Administration Disability

9   Determination Service ("DDS") physician, completed the Physical Residual Functional Capacity

10  ("RFC") Form assessing plaintiff's exertional limitations, postural limitations, manipulative

11  limitations, visual limitations, communicative limitations, and environmental limitations.  AR

12  234-40.  Dr. Clancey concluded that plaintiff could occasionally lift and carry a maximum of

13  twenty pounds; could frequently lift and carry a maximum of ten pounds; could stand/walk for a

14  total of about six hours in an eight hour workday; could sit (with normal breaks) for a total of

15  about six hours in an eight hour workday; had an unlimited ability to push and/or pull (including

16  operation of hand and/or foot controls) subject to her limitations regarding lifting and carrying;

17  was able to frequently climb ramps, stairs, and ladders, but only occasionally climb ropes and

18  scaffolds; was able to balance, stoop, kneel, and crouch frequently; was only able to crawl

19  occasionally; had an unlimited ability to reach in all directions, including overhead, unlimited

20  fine finger manipulation, and unlimited feeling in her skin receptors; had limited ability in her

21  left hand with gross manipulation/handling; had no visual or communicative limitations; and had

22  no environmental limitations, except that she should avoid concentrated exposure hazards, such

23  as machinery and heights.  *Id.*

24      DDS Mental Residual Functional Assessment, C.H. Dudley, M.D. - January 30, 2006

25      On January 30, 2006, Dr. C.H. Dudley, M.D., evaluated plaintiff and completed a

26  psychiatric review technique form.  *Id.* at 148-61, 258-61.  Dr. Dudley found that plaintiff had

bipolar disorder and ETOH cocaine dependence in remission. *Id.* at 151, 156. She opined that

plaintiff would have no restrictions on her activities of daily living, and only mild difficulties in

maintaining social functioning and in maintaining concentration, persistence, or pace. *Id.* at 158.

On the Mental RFC Assessment form, Dr. Dudley concluded that plaintiff would not be

significantly limited in the ability to remember locations and work-like procedures; to

understand and remember very short and simple instructions; to carry out very short and simple

instructions; to maintain attention and concentration for extended periods; to perform activities

within a schedule, maintain regular attendance, and be punctual within customary tolerances; to

sustain an ordinary routine without special supervision; to work in coordination with or

proximity to others without being distracted by them; to make simple work-related decisions; to

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; to ask simple questions or request assistance; to accept instructions and respond

appropriately to criticism from supervisors; to get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and

to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in

the work setting; to be aware of normal hazards and take appropriate precautions; to travel in

unfamiliar places or use public transportation; and to set realistic goals or make plans

independently of others. *Id.* Dr. Dudley found that plaintiff would be moderately limited in her

ability to understand and remember detailed instructions; to carry out detailed instructions; and

to interact appropriately with the general public. *Id.* In her final RFC assessment, Dr. Dudley

opined:

> The claimant can understand, remember, and carry out simple
> instructions. The claimant has adequate judgment for simple
> work-related decisions. The claimant has adequate response to
> deal appropriately with supervisors, co-workers, work situations,
> and changes in a routine work setting. The claimant has the basic
> mental ability, sustained concentration and persistence, social
> interaction, and adaptation for unskilled work on a consistent basis

7

1    over an eight-hour work day in a forty-hour work week.

2  *Id.* at 260.

3    B.  <u>Treatment Records</u>

4    The record contains mental health treatment records from Sacramento County Mental

5  Health, Northgate Point, and Visions Unlimited covering 2004 through 2007.  *Id.* at 167-72,

6  173-228, 264-68, 269-75.  In March 2004, plaintiff was hospitalized for three days at

7  Sacramento County Mental Health after a suicide attempt by hanging.  She admitted she had

8  been using cocaine, crank and alcohol.  *Id.* at 203, 219.  Her discharge diagnosis was:

9          Axis I: Bipolar d/o NOS
           Cocaine, Amphetamine, and Alcohol dependence
10         Axis II: Borderline Traits
           Rule out Social Phobia
11         AxisIII: Sickle Cell traits
           Axis IV: Major Stressors 1,2,3, 4, 5
12         Axis V: GAF at discharge 50

13  *Id.* at 199.

14    On May 22, 2004, plaintiff sought treatment for symptoms of depression and reported

15  that she had been sober for 40 days.  *Id.* at 170-72, 183-84.  She reported that she has attempted

16  suicide several times in the past, and that she was taking medications for depression.  There was

17  some evidence of paranoia on exam but the remaining mental status exam did not show any

18  significant abnormalities.  The doctor noted that plaintiff's psychosis had responded in the past

19  to medications but that she had been off medications for two weeks and had an increase in

20  paranoia and other symptoms.  Plaintiff was diagnosed with a bipolar disorder, and psychosis,

21  NOS.  She was also diagnosed with a substance abuse disorder in early remission and a

22  substance induced mood disorder.  She was prescribed medications, told to attend AA and NA

23  and advised to attend individual therapy.  *Id.*

24    When seen in August of 2004, plaintiff had stopped taking one of her medications,

25  Prozac, because she had developed a rash.  She was prescribed different medications.  *Id.* at 169.

26  ////

1   She was seen at Northgate Point on October 12, 2004; and at Sacramento County Mental Health

2   on March 30, 2005 and on August 15, 2005.  *Id.* at 168, 174, 179.  She also failed to show up at

3   several appointments at Sacramento County Mental Health in 2005.  *Id.* at 175, 176, 180.

4          On January 23, 2006, plaintiff reported to Dr. Globus at Northgate Point that she was

5   hearing voices and was fearful of leaving her home due to paranoid ideation.  *Id.* at 267.  He

6   observed that she was paranoid, had a thought disorder, and a flat affect.  He also observed that

7   she "is socially appropriate."  He assessed that plaintiff was a "psychotic individual who has had

8   minimal response to current regime."  *Id.*  He noted that her medication compliance was

9   "always" but that her medication response was "inadequate."  *Id.*  His DSM-IV diagnosis was:

10               Axis I: 296.80
                 Bipolar Disorder NOS
11               304.20 Cocaine dependance
                 Axis II: V71.09 No diagnosis
12               Axis III: Dermatitis
                 Axis IV: 1,6
13               Axis V: 50

14   *Id.* at 268.  Her medications included Depakote, Zyprexa, Wellbutrin XL, Prozac and

15   Hydroxyzine.  *Id.* at 266.

16          In July 2006, plaintiff sought treatment, complaining of symptoms of bipolar disorder,

17   with psychotic features.  It was noted that plaintiff was not taking her medications.  On August

18   26, 2006, Dr. Soliman from Visions Unlimited assessed plaintiff with the following DSM-IV

19   diagnosis:

20               Axis I: Bipolar Disorder With Psychotic Features
                 Axis II: Deferred
21               Axis III: Sickle cell trait
                 Axis IV: housing, economic, and other psychosocial problems
22               Axis V: 52

23   *Id.* at 274.  Dr. Soliman noted that plaintiff "usually takes meds" and that her current

24   medications included zyprexa, depakote, hydroxyzine, and benedryl.  *Id.* at 274-75.

25          On November 20, 2006, Dr. Soliman noted that plaintiff's response to medication had

26   been "less than adequate."  *Id.* at 272.  He observed that plaintiff had not improved and that she

9

1 had not been taking her medication for the past two months because her Medi-Cal had been cut

2 off.  He noted that "overall, she continues to have auditory hallucinations, visual hallucinations,

3 paranoia, sleeping problems, mood swings, and depressive symptoms."  *Id.*

On February 3, 2007, Dr. Soliman reported that plaintiff had not improved.  Plaintiff

5 reported that she had not been able to take her medication because it would take two weeks for

6 the pharmacy to fill her prescription.  Dr. Soliman observed that her VPA (Valporic acid or

7 Depakote) levels came back low so he wasn't sure if she was taking her medication or not.

8 Plaintiff reported auditory hallucinations, visual hallucinations, paranoia, sleeping problems,

9 mood swings, and depressive symptoms.  He increased her Hydroxyzine and ordered another

10 VPA test.  *Id.* at 270.

11 IV.  SUMMARY OF TESTIMONY

12 Plaintiff and vocational expert (VE) Jim Van Eck, testified at plaintiff's March 22, 2007,

13 hearing.  Plaintiff testified that she was born April 3, 1966, and was 40 years of age.  AR at 284.

14 She stated that she had an eighth grade education and had never received a GED.  *Id.*  Plaintiff

15 testified that her past work experience included in-home care, security, and packing/handling

16 work.  *Id.* at 285.  She reported that her longest job was for three months at Payless Shoe Source

17 in customer service.  *Id.* at 286.

18 Plaintiff testified that in approximately 1994, she injured her left ankle which had three

19 pins, and her left wrist which had two pins when she jumped from a two-story window.  *Id.* at

20 286-87.  She reported that she was under mental health care at Visions and had been going there

21 for approximately five months.  *Id.* at 287.  She reported that she attended most of her

22 appointments but stated, "sometimes I can't get up to go."  *Id.* at 287.  She explained, "The

23 medication that I take it makes me, it makes, it doesn't motivate me to get up.  I most, spend

24 most of the time sleeping."  *Id.* at 287-88.  She testified that she was taking Zyprexa, Depakote,

25 Hydroxyzine, and Benedryl.  *Id.* at 288.  She testified that she was last seen at Visions about a

26 month ago by Dr. Soliman.  *Id.*

1    Plaintiff testified that she stopped going to Northgate Point because, "I couldn't make it

2    way out there all the time." *Id.* at 289.  She testified that she was still not taking cocaine and had

3    been clean for three years. *Id.* at 289-90.  Plaintiff testified that she had not used cocaine since

4    she last went to the hospital, and her attorney advised that this was in 2004. *Id.* at 291.  Plaintiff

5    testified that she went to the hospital because she tried to kill herself. *Id.* at 292.  She stated that

6    she had tried to hurt herself three times.  The first time she was approximately 38 years old and

7    had jumped out of a window. *Id.*  Her last attempt was a week ago and she took six or seven

8    Zyprexa pills but did not report it to anyone. *Id.* at 292-93.

9    Plaintiff testified that she had been seen at Visions three times. *Id.* at 294.  The ALJ

10   specifically noted that these records made no reference to drug use. *Id.* at 295.  The ALJ noted

11   that it was approximately 15 months after her suicide attempt in 2004 before she applied for

12   Social Security again. *Id.* at 302.  The ALJ asked why she waited so long. *Id.*  Plaintiff testified,

13   "Well, I didn't know it was that bad for me, I didn't know it was that bad for me.  [What was so

14   bad, how bad for you?]  The mental health." *Id.* at 303.

15   Plaintiff estimated that she could lift approximately 30 pounds with her right hand but

16   only about five pounds with her left hand. *Id.* at 296.  She stated that she could stand for twenty

17   to thirty minutes after which her legs and feet hurt. *Id.*  She testified that she could walk

18   approximately a block-and-a-half before her feet started to hurt. *Id.* at 297.  She stated that she

19   had gotten to the hearing by bus and light rail, and that she could sit "all day." *Id.*  The ALJ

20   asked plaintiff if she had any other medical problems that limited her ability to work aside from

21   the sickle cell trait, pins in her wrist and ankle, and her mental problems.  Plaintiff responded:

22              That's it, that's it and just from taking medication at night is, I ask
             my doctor would he give me something like for the daytime to help
23           me want to get up and do things because I'll just stay in bed all
             day.
24   *Id.* at 297.

25   Plaintiff testified that she was having trouble sleeping and that it was hard for her to get

26   to the doctor's office. *Id.* at 298-99.  She testified that she had been having a hard time getting

11

her medications and therefore not always taking it.  *Id.* at 300.  She testified that she often feels like just staying in the house, sometimes she hears music in her apartment when no music is playing, and sometimes if she does not take her medication for two days, she hears voices.  *Id.* at 301, 304.  Plaintiff testified that she had last taken her medication a week ago and that although her prescriptions were filled yesterday, she had not yet picked them up.  *Id.* at 305.

After the VE testified about plaintiff's past work history, the ALJ asked the VE whether someone of the same age, education, and vocational profile of plaintiff, with the residual functional capacity to lift 10 pounds frequently and 20 pounds occasionally; who was limited to occasional squatting and crawling; who could not work on scaffolds, ladders, and ropes; who could frequently do postural activities; who should avoid concentrated exposure to hazards such as uneven terrain; who would be limited to occasional handling with her left upper extremity; who could sit about six hours per day, eight hour day; and who could stand and walk no more than four hours per eight-hour day, could perform any of plaintiff's prior work on a sustained, regular and reliable basis.  *Id.* at 308- 10.  The VE responded, "No."  *Id.* at 310.  The ALJ then asked whether there were any jobs that the hypothetical person could perform on a sustained, regular and reliable basis, *id.*, and the VE testified that the hypothetical person could work as a callout operator for business services, an election clerk, or a surveillance system monitor.  *Id.* at 310-11.

The ALJ then asked the VE to assume that the hypothetical person could understand, remember, and carry out simple instructions; has adequate judgment for simple work-related decisions; has adequate response to deal appropriately with supervisors, co-workers, work situations, and changes in routine work setting; and has the basic mental ability, sustained concentration and persistence, social interaction, and adaptation for unskilled work on a consistent basis over an eight hour day in a 40-hour work.  *Id.* at 315-16.  The VE testified that would not change his previous answers.  *Id.* at 316.

////

12

1    Plaintiff's attorney then asked the VE whether someone who had moderate difficulties

2    interacting with co-workers and the public defined as up to one-third of the day, would be able to

3    do the jobs identified.  *Id*.  The VE responded, "No."  *Id*.

4    V.  LEGAL STANDARDS

5    The Commissioner's decision that a claimant is not disabled will be upheld if the findings

6    of fact are supported by substantial evidence in the record and the proper legal standards were

7    applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000);

8    *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*,

9    180 F.3d 1094, 1097 (9th Cir. 1999).

10    The findings of the Commissioner as to any fact, if supported by substantial evidence,

11    are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

12    more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521

13    (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

14    support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

15    *Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

16    "The ALJ is responsible for determining credibility, resolving conflicts in medical

17    testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

18    2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

19    interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

20    *Thomas v. Barnhart*, 278  F.3d 947, 954 (9th Cir. 2002).

21    VI.  ANALYSIS

22    A.  Failure to Credit the Opinions of Drs. Behniwal, Globus, and Soliman

23    Plaintiff contends that the ALJ erred by failing to credit the treating and examining

24    opinions of Drs. Behniwal, Globus, and Soliman.  Dckt. No. 20 at 16-19.  Specifically, plaintiff

25    contends the ALJ should have credited Dr. Behniwal's opinion that plaintiff would find it

26    moderately difficult to interact with coworkers and the public, would find it mildly difficult

to perform work activities on a consistent basis, and might find it mildly difficult to maintain regular attendance in the workplace and complete a normal workday/workweek, or deal with the usual stress encountered in competitive work.  *Id.* (citing AR at 166).  Plaintiff contends that opinion was consistent with her GAF assessment of 59, which reflected "moderate" limitations, as well as the opinions of plaintiff's treating psychiatrists, Drs. Globus and Soliman.  *Id.*  In January of 2006, Dr. Globus stated that plaintiff was a "psychotic individual who has had minimal response to current regime"; noted that although plaintiff complied with her medication, her response to the medication was inadequate; and assessed plaintiff with a GAF of 50, indicating "serious" limitations.  *Id.* (citing AR at 267).  In August 2006, Dr. Soliman assessed plaintiff with Bipolar Disorder with Psychotic Features; noted that plaintiff "usually takes meds"; and assessed plaintiff with a GAF of 52, denoting moderate limitations.  *Id.* (citing AR at 274-75).

Plaintiff argues that it was improper for the ALJ to accord Dr. Behniwal's assessment only "partial weight," since none of the ALJ's reasons for rejecting Dr. Behniwal's opinion provided a legitimate basis for doing so.  Plaintiff contends that although the ALJ noted that Dr. Behniwal's assessment was completed four months before plaintiff applied for disability benefits, Dr. Behniwal's examination of plaintiff was, for all practical purposes, contemporaneous with her application, and provided valuable evidence regarding plaintiff's functional limitations at the time of application.  *Id.* at 17-18.  Plaintiff also contends that although the ALJ discredited Dr. Behniwal's opinion as inconsistent with the opinion of the nonexamining state agency physicians, the nonexamining opinions did not constitute substantial evidence that justified rejecting Dr. Behniwal's examining opinions.  *Id.* at 18.  Finally, plaintiff argues that the ALJ's third reason for discrediting Dr. Behniwal – that plaintiff did not specifically testify that she had difficulty getting along with people – is without merit, since plaintiff *did* testify that she sometimes hears "people talking like they're trying to jump me or waiting for me to come out so that they can get me or something like that," and plaintiff did

14

1   report that getting along with family, friends, neighbors, or others, was not really an issue

2   because plaintiff keeps to herself. *Id.* (citing AR at 304, 105).  Plaintiff's mother also reported

3   that plaintiff did not get along well with others and that her bipolar condition made her angry.

4   *Id.* (citing AR at 113-14).

5        Defendant counters that the ALJ properly assessed the medical opinions in this case.

6   Dckt. No. 21 at 2-4.  Specifically, defendant contends that Dr. Behniwal's conclusion that

7   plaintiff would have moderate difficulties interacting with coworkers and the public did not

8   compel a finding that those difficulties significantly affected plaintiff's ability to perform a wide

9   range of unskilled light work.  *Id.* at 3.  Furthermore, defendant contends, the ALJ's assessment

10  of the evidence was correct because he followed the special evaluation process required for

11  assessing the materiality of drug and alcohol abuse.  *Id.*  According to defendant, Dr. Behniwal's

12  assessment failed to reflect what plaintiff's limitations would be if she stopped her drug abuse, as

13  required under the regulations.  *Id.*  Defendant further notes that Dr. Behniwal's incomplete

14  assessment predated plaintiff's SSI application by 4 months, so the ALJ properly relied on

15  evidence that was both more recent and more reliable in assessing her substance abuse during the

16  relevant period.  *Id.*  Finally, defendant contends that the ALJ was able to separate out the effects

17  of plaintiff's other impairments, and properly relied on uncontradicted state agency physicians

18  who opined that plaintiff had the ability to respond appropriately to supervisors, co-workers,

19  work situations, and changes in a routine work setting, and had the basic mental ability,

20  sustained concentration and persistence, social interaction, and adaptation for unskilled work.

21  *Id.* at 4 (citing AR at 22, 260).

22       Here, after discussing plaintiff's medical evidence, and before concluding that absent

23  substance abuse, plaintiff has the RFC to perform unskilled, light work with specific limitations,

24  the ALJ stated the following:

25              In regards to the claimant's limitations due to her independent
             bipolar/depressive disorder, the undersigned agrees with the most
26              recent assessment by the physicians with the Disability

Determination Service[.]  These physicians opined in January of 2006 that absent substance abuse, the claimant is able to understand, remember, carry out simple instructions.  She had adequate judgment for simple work-related decisions.  She had adequate response to deal appropriate[ly] with supervisors, co-workers, work situations, and changes in routine work setting.  She has the basic mental ability, sustained concentration and persistence, social interaction, and adaptation for unskilled work on a consistent bas[i]s over an 8 hour work day in a 40 hour workweek.

The undersigned has adopted the above assessment because it is consistent with the treating evidence submitted.  The undersigned has carefully reviewed the treating records submitted from Northgate Point Treatment Center, Visions Mental Health Clinic and Sacramento Mental Health Center[.]

The majority of the treatment records from Northgate are for a period prior to the date of the claimant's most recent application.  Records from Northgate span the period from May of 2004 through April of 2006.  The first record from Northgate is dated May 22nd, 2004.  This was an intake interview.  The claimant[] sought treatment for symptoms of depression.  She reported she had been sober for 40 days.  She reported that [s]he has attempted suicide several times in the past.  She reports she is currently depressed, has low energy, low appetite, problems sleeping, problems with concentration and is isolative.  She was taking medications for depression.  There was some evidence of paranoia on exam but the remaining mental status exam did not show any significant abnormalities.  The doctor noted that the claimant's psychosis had responded in the past to medications but that she had been off medications for two weeks and had an increase in paranoia and other symptoms.  The claimant was diagnosed with a bipolar disorder, and psychosis, NOS.  She was also diagnosed with a substance abuse disorder in early remission and a substance induced mood disorder.  She was prescribed medications, told to attend AA and NA and advised to attend individual therapy.

When next seen in August of 2004 the claimant had stopped taking one of her medications, Prozac, because she had developed a rash.  She was prescribed different medications.  Records show she was seen on two other occasions in 2004.  There are no record[s] of treatment in 2005.  She was seen once in 2006 complaining of increased paranoia and hallucinations [] and asked for a change in medications.  She was prescribed new medications and told to return in three months.  She was diagnosed with a bipolar disorder NOS and cocaine dependence.  There was no notation that her substance abuse disorder was in remission.  The next record shows that the claimant was discharged from treatment because she had failed to follow through to complete paperwork.

Records from Sacramento Mental Health Center and Visions also primarily contain records for the period prior to the date she applied for benefits (July 15th, 2005). Of the 55 pages of records from Sacramento Mental Health, 50 of 55 pages are for the period prior to July 2005.

These records show that in March of 2004 the claimant was admitted for psychiatric care after she reported she had attempted suicide by wrapping a cord around her head. The claimant also reported that she was experiencing visual and auditory hallucinations. She reported in the past she had tried to stab herself with a knife while hallucinating. She reported she had been sober for 11 months but had relapsed in February of 2004. She was actively using drugs. She tested positive for cocaine and amphetamines. She also reported she had experienced manic symptoms during her period of sobriety but there are no medical records to confirm her reports.

Treating records show that after she was placed on medications, her symptoms rapidly improved and she was discharged two to three days after admission. Her discharge diagnosis was amphetamines and cocaine induced mood and psychiatric disorder and a bipolar disorder (NOS); alcohol dependence and cocaine dependence[.]

The most recent records submitted show that the claimant sought treatment in July of 2006 complaining of symptoms of bipolar disorder, with psychotic features. It was noted that the claimant was not taking her medications. The claimant denied substance abuse. She was prescribed medications but the last progress note date February 2, 2007, shows that the claimant still had not started taking her medications[.] The undersigned notes that it does not appear testing showed evidence of drug abuse, but testing confirms that [s]he was not taking a therapeutic dose of her medications.

The above are the only treating records submitted. A review of the above records clearly shows that the claimant has primarily sought treatment on only [an] occasional basis. When she has sought treatment, she has reported experiencing delusions, hallucinations, an[d] other psychotic symptoms, due to drug abuse and/or, because she has failed to take her medications. Thus, there is no objective medical records to support the claimant's allegations that she has symptoms of a bipolar disorder, which limits her ability to work, during periods in which she takes her medications.

The undersigned finds that the lack of treatment records during the period the claimant was taking medications indicates th[at] her symptoms are under good control when she takes her medications and is not abusing drugs or alcohol. She only seeks treatment[] when her symptoms increase due to lack of medications or when she abuses drugs and alcohol.

Therefore, the undersigned agrees with the assessment by the physicians with the Disability Determination Service, that the claimant is able to perform a wide range of unskilled work absent substance abuse, and considering only her bipolar disorder/depressive disorder.

***

The undersigned notes that the claimant's attorney has argued that it should also be found that the claimant has a moderate limitation in the ability to interact with coworkers and the public. The claimant's attorney argues that this restriction is supported by the comprehensive psychiatric evaluation which took place in March of 2005. The undersigned has reviewed this assessment and has given this assessment only partial weight. This assessment was completed four months prior to the date the claimant applied for benefits. Thus, it is not contemporaneous with the period at issue. Additionally, the undersigned notes that the physicians with the Disability Determination Service also had the opportunity to review this report, and while they found that the claimant has a moderate limitation in the ability to interact appropriately with the general public, they concluded that the claimant has an adequate response to deal appropriately with supervisors, co-workers, and the public. The undersigned agrees with this assessment. While the claimant[] and the claimant's mother report[] that the claimant has difficulty getting along with others, the undersigned notes that there have been no reports in the medical treatment records of difficulty getting along with medical personnel. The claimant also has not reported significant interpersonal problems. She did not state at the hearing that she was unable to work because of difficulty working with others. Therefore, the undersigned does not agree with a restriction to moderate limitations in the ability to interact appropriately with the public, coworkers or supervisors.

*Id.* at 19-21, 22.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Lester*, 81 F.3d at 830. Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285. To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical

professional only for "clear and convincing" reasons. *Lester,* 81 F.3d at 831. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons, that are supported by substantial evidence. *Id*. at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

Here, the ALJ considered all of the medical opinions in the record, including those of Dr. Behniwal and plaintiff's treating doctors. The ALJ set out a thorough summary of the facts and conflicting clinical evidence, discussing the treating and examining physicians' findings and conclusions. The ALJ accepted much of Dr. Behniwal's assessment, but did not credit Dr. Behniwal's conclusion that plaintiff would be moderately limited in her ability to interact appropriately with the public, coworkers or supervisors. That conclusion arguably conflicted with that of Dr. Dudley, who opined that plaintiff had adequate response to deal appropriately with supervisors, co-workers, work situations, and changes in a routine work setting, and had the basic mental ability, sustained concentration and persistence, social interaction, and adaptation for unskilled work on a consistent basis over an eight-hour work day in a forty-hour work week.

Therefore, the ALJ could only reject Dr. Behniwal's conclusion for "specific and legitimate" reasons, that are supported by substantial evidence. The ALJ did just that. The ALJ made clear that he was rejecting Dr. Behniwal's conclusion because (1) the assessment was completed four months prior to the date the claimant applied for benefits and was thus not contemporaneous with the period at issue; (2) Dr. Behniwal's conclusion conflicts with that of the DDS physicians, who reviewed Dr. Behniwal's report and found that although plaintiff has a moderate limitation in the ability to interact appropriately with the general public, plaintiff has an adequate response to deal appropriately with supervisors, co-workers, and the public; and (3) while plaintiff and her mother reported that plaintiff has difficulty getting along with others,

19

there were no reports in the medical treatment records of difficulty getting along with medical

personnel, and plaintiff did not state at the hearing that she was unable to work because of

difficulty working with others.  *Id.* at 22.  The ALJ also explained that he was crediting the

opinions of the DDS physicians, as opposed to Dr. Behniwal's opinion, because Dr. Behniwal's

opinion was not supported by the objective medical evidence, which the ALJ stated shows that

when plaintiff takes her medication and does not abuse drugs or alcohol, her symptoms are under

good control.  *Id.* at 20-21; *see* 42 U.S.C. § 423(d)(2)(c) (an individual is not considered to be

disabled, for Social Security purposes, if alcoholism or drug addiction is a contributing factor

material to the disability determination); 20 C.F.R. § 416.935; *Bayliss v. Barnhart*, 427 F.3d

1211, 1217 (9th Cir. 2005) (ALJ may reject opinion that was based on claimant's unreliable

allegations).  Moreover, Dr. Globus did not opine that plaintiff had any specific mental

limitations, and Dr. Soliman found that plaintiff's medications were effective, even though

plaintiff did not always take them.  AR at 267-68; 175-80, 188, 265, 268, 270-75, 289).

Additionally, it was proper for the ALJ to consider the timing of the assessments in evaluating

the conflict between them, and the fact that plaintiff had no difficulty getting along with medical

personnel and did not state at the hearing that she was unable to work because of difficulty

working with others were legitimate reason for calling into question Dr. Behniwal's conclusion

that plaintiff would be moderately limited in her ability to interact appropriately with the public,

coworkers or supervisors.

There were cogent and legitimate reasons for resolving the conflict between the opinions

of Drs. Behniwal and Dr. Donley in the manner that the ALJ did.  *See Saelee v. Chater*, 94 F.3d

520, 522 (9th Cir. 1996) (findings of a nontreating, nonexamining physician can amount to

substantial evidence where other evidence in the record supports the findings).  It is "solely the

province of the ALJ" to resolve any such conflicts.  *See Andrews*, 53 F.3d at 1041.  Accordingly,

the court finds that the ALJ applied the proper standards in weighing the medical evidence and

that his determination of plaintiff's RFC was supported by substantial evidence in the record.

1    Therefore, plaintiff is not entitled to relief on this ground.

2           B.   Failure to Properly Credit the Testimony and Statements of Plaintiff and Her Mother

3           Plaintiff also argues that the ALJ erred by failing to properly credit plaintiff's testimony

4    and the statement of plaintiff's mother.  Dckt. No. 20 at 19-24.  Plaintiff argues that the medical

5    record documented that plaintiff suffered from bipolar disorder and was status post left wrist

6    fracture and left ankle fracture, and that she exhibited the symptoms expected of someone with

7    those impairments, yet the ALJ improperly discredited plaintiff's testimony about the extent of

8    those symptoms.  *Id.* at 19-20.  Plaintiff contends that although the ALJ cited plaintiff's drug use

9    as one of the bases for discrediting her testimony, there was no mention of active drug use any

10   time after plaintiff's 2004 hospitalization, which occurred 15 months before she applied for

11   disability benefits.  *Id.* at 20.  Plaintiff also argues that, with respect to lack of treatment and

12   missed appointments, plaintiff reported that she tried to make her scheduled appointments but

13   that sometimes she could not get out of the house and her depression makes her very forgetful.

14   *Id.* at 21 (citing AR at 103, 104).  According to plaintiff, "[g]iven the record-as-a-whole, and the

15   symptoms of [plaintiff's] bipolar disorder, including depression, the ALJ's bald assertion that

16   'the lack of treatment records during the period the claimant was taking medications indicates

17   that her symptoms are under good control,' was without foundation."  *Id.*  Third, plaintiff

18   contends that with respect to medication compliance, plaintiff "freely testified that there had

19   been times when she wasn't able to take her medication," but she also provided good reasons for

20   her failure to do so and there was no evidence that her medication would mitigate her symptoms

21   to the point she could work.  *Id.* at 21-22.

22          Further, plaintiff contends that the ALJ failed to provide legitimate reasons for rejecting

23   the third party statements of plaintiff's mother.  *Id.* at 23 (citing AR at 108-13).  Plaintiff argues

24   that "[h]ad the ALJ properly evaluated and credited [plaintiff's] testimony and properly

25   evaluated and credited the third party statements of her mother, a finding of disability would

26   have necessarily followed."  *Id.*

21

1    Defendant counters that the ALJ's credibility finding was supported by substantial

2    evidence and free of error.  Dckt. No. 21 at 5.  Defendant argues that the ALJ provided sufficient

3    reasons, supported by substantial evidence, for discounting plaintiff's testimony as to her drug

4    use and mental limitations, including plaintiff's failure to disclose her addiction, her limited

5    treatment history during the relevant period, the effectiveness of medication, and plaintiff's

6    failure to go to her appointments and fully comply with medication requirements.  *Id.* (citing AR

7    at 14-22).  Defendant also contends that the ALJ properly found that plaintiff's mother's

8    statements did not constitute a separate line of evidence and failed to bolster plaintiff's own

9    testimony, which the ALJ found not credible.  *Id.* (citing AR at 17-18, 22).

10    In evaluating whether subjective complaints are credible, the ALJ should first determine

11    whether the claimant has presented objective medical evidence of an underlying impairment

12    "which could reasonably be expected to produce the pain or other symptoms alleged."  *Bunnell*

13    *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  If there is objective medical evidence

14    of an impairment, the ALJ then may consider the nature of the symptoms alleged, including

15    aggravating factors, medication, treatment and functional restrictions.  *Id.* at 345-47.  The ALJ

16    also may consider: (1) the applicant's reputation for truthfulness, prior inconsistent statements or

17    other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment

18    or to follow a prescribed course of treatment, and (3) the applicant's daily activities.  *Orn v.*

19    *Astrue*, 495 F.3d 625, 636 (9th Cir. 2007); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

20    "Without affirmative evidence showing that the claimant is malingering, the Commissioner's

21    reasons for rejecting the claimant's testimony must be clear and convincing."  *Morgan v.*

22    *Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *see also Lingenfelter v. Astrue*,

23    504 F.3d 1028, 1036 (9th Cir. 2007).  To support a lack of credibility finding, the ALJ must

24    "point to specific facts in the record which demonstrate that [the claimant is in less pain or the

25    claimant's symptoms are less severe] than she claims."  *Vasquez v. Astrue*, 547 F.3d 1101, 1105

26    (9th Cir. 2008).

Additionally, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *see also Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993) (friends and family members in a position to observe a plaintiff's symptoms and daily activities are competent to testify to condition); 20 C.F.R. § 404.1513(d)(4) (providing that evidence provided by lay witnesses may be used to show "the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work"). "If the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." *Dodrill*, 12 F.3d at 919; *see also Bruce v. Astrue*, 2009 WL 539945, at *1 (9th Cir. Mar. 5, 2009) (finding that the ALJ erred in rejecting, without sufficient comment, the lay witness testimony of the plaintiff's wife); *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (finding that the ALJ erred by failing to consider the lay testimony of two witnesses about how the plaintiff's impairments affected his ability to work).

Here, the ALJ specifically addressed plaintiff's testimony and the reports of plaintiff's mother, and made the following specific findings regarding their credibility:

> The undersigned does not find the claimant's testimony to be credible. The claimant has denied drug abuse in the past, but medical records show that she has continued to abuse drugs. Thus, her testimony cannot be relied upon. In fact, the record shows that the claimant has a history of not fully disclosing her drug use. When she was seen by a consultative psychiatric physician in March of 2005, she reported she had not used drugs or alcohol for a three-year period[.] However, the medical records clearly show that less than one year prior to this exam, the claimant was seen at Northgate Pointe Medical Center on May 22, 2004 and reported that she had been sober for 40 days. Thus, she was using alcohol in early 2004. Additionally, in March of 2004 the claimant tested positive for both cocaine and amphetamines when seen at Sacramento Mental Health Center[.] On this occasion the claimant reported that after she binges on drugs and/or when she is coming down from a drug high, she becomes suicidal and also has both auditory and visual hallucinations. On this occasion, the claimant reported she had a suicide attempt (by wrapping a cord around her neck) but was unable to take any further action to injure herself and thus, had removed the cord. As noted above, treating records in 2006 also show that the claimant continues to be diagnosed with

1         a cocaine dependent disorder[.]

2                              ***

3         Clearly, if the undersigned were to find the . . . testimony of the
        claimant and the reports of third parties to be credible, a finding of

4         disability would be directed.  However, subjective complaints,
        standing alone, do not provide a basis to find "disability," and the

5         undersigned finds that the objective medical evidence[] does not
        support the degree of fatigue, pain, depression and other

6         limitations as alleged by the claimant and third parties.  Rather, it
        appears that when the claimant takes her medications, her

7         bipolar/depressive symptoms are under good control.  As seen
        below, the only time the claimant has sought medical treatment is

8         after a period of intense drug use or during periods her symptoms
        increase because she is not taking her medication.  Additionally,

9         there are very few treating records for the period after she applied
        for benefits.  The claimant must provide objective evidence of

10       disability.  A finding of disability may not be based only upon
        subjective complaints.

11

12       If the claimant stopped the substance abuse, the undersigned finds
        that the claimant's medically determinable impairments do not
        result in an inability to perform all work.

13

14 AR at 14, 18.  The ALJ also stated that in making his RFC determination, he did "not find

15 credible the claimant or third party reports that the claimant is unable to work due to symptoms

16 of depression and or a bipolar disorder during periods in which she takes her medications,"

17 because there were no medical records to support the allegation.  *Id.* at 21.  Finally, he stated that

18 "most of the subjective complaints complained of are not credible."  *Id.*  He noted that "at the

19 hearing, [plaintiff] testified she was limited to lifting 30 pounds with her right upper extremity.

20 While there is evidence that [plaintiff] injured her left upper extremity, there is no evidence of a

21 right upper extremity impairment[] and [plaintiff] has never complained of right arm pain.  As

22 noted,  [plaintiff] has also admitted that she has not recently sought treatment for either arm pain,

23 wrist pain or pain in her ankles. If [plaintiff] were experiencing pain and limitations, it appears

24 she would have sought treatment."  *Id.*

25 ////

26 ///

                          24

1      Ultimately, the ALJ concluded that plaintiff was not fully credible due to her failure to

2  fully disclose her drug use; because many of plaintiff's subjective symptoms were controlled by

3  medication; and because many of plaintiff's alleged symptoms were not supported by any

4  objective evidence.  *Id.*  Those credibility findings were thoroughly explained and supported in

5  the ALJ's decision.  Although plaintiff may disagree with the specific findings regarding her

6  credibility, because the findings were supported by clear and convincing evidence in the record,

7  the court will not second-guess that finding.  *Thomas*, 278 F.3d at 959.

8      Additionally, here the ALJ specifically stated that he did not find the reports of plaintiff's

9  mother to be credible for the same reasons that plaintiff's testimony was not credible.  Although

10  plaintiff argues otherwise, it was not improper to reject plaintiff's mother's testimony as

11  duplicative of plaintiff's subjective complaints, which the ALJ properly discredited.  *Valentine v.*

12  *Comm'r of the Soc. Sec. Admin*, 574 F.3d 685, 694 (9th Cir. 2009) ("In light of our conclusion

13  that the ALJ provided clear and convincing reasons for rejecting Valentine's own subjective

14  complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows

15  that the ALJ also gave germane reasons for rejecting her testimony").  Therefore, plaintiff is not

16  entitled to relief on this ground.

17      C.  Failure to Pose a Legally Adequate Hypothetical to the VE

18      Finally, plaintiff contends that the ALJ erred by failing to pose a legally adequate

19  hypothetical to the VE and failing to credit the testimony of the VE in response to the

20  hypothetical which accurately reflected plaintiff's functional limitations.  Dckt. No. 20 at 24-26.

21  Plaintiff notes that neither of the ALJ's hypotheticals included the psychiatric-based limitations

22  assessed by Dr. Behniwal and reported by plaintiff and her mother, and that when asked whether

23  the hypothetical person suggested by the ALJ would be able to perform the identified jobs if the

24  moderate limitations assessed by Dr. Behniwal were added, the VE replied "No."  *Id.* at 25

25  (citing AR at 316).  Plaintiff further argues that the ALJ improperly relied on the VE's testimony

26  since the ALJ did not ask the VE whether there were any conflicts between the occupational

1    evidence he provided and the Dictionary of Occupational Titles ("DOT"), much less identify and

2    resolve any such conflicts.  Plaintiff contends this was especially important since all three job

3    categories identified by the VE only produced 325 positions regionally.  *Id.* at 26.

4         Defendant counters that the VE's testimony was properly based on hypothetical

5    questions that included all of plaintiff's limitations that the ALJ found supported by the record.

6    Dckt. No. 21 at 6.  Defendant also argues that plaintiff's contention that the VE failed to resolve

7    inconsistencies between his testimony and the DOT has no merit since the specific DOT

8    description of the requirements for a call out operator are consistent with the VE's testimony.  *Id.*

9    Moreover, defendant notes that the "argument is immaterial unless the Court also concludes that

10   the number of other work available in the economy would no longer be significant if the call out

11   operator job was not available.  *Id.*  Defendant argues, however, that plaintiff improperly focuses

12   only on the availability of jobs in the local economy (as opposed to nationally), and that the VE

13   identified thousands of jobs available in the national economy, including 36,000 jobs for the

14   surveillance system monitor and election clerk alone.  *Id.* (citing AR at 310).

15        Here, the the ALJ's hypothetical to the expert reflected his RFC determination, which as

16   set forth above, was supported by substantial evidence.  This was an appropriate hypothetical

17   based on the ALJ's ultimate interpretation of the evidence.  The ALJ was not required to include

18   limitations that he found to be unsupported by substantial evidence in the record.  *See*

19   *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (ALJ is not bound to accept limitations

20   that are not supported by substantial evidence); *Embrey v. Bowen*, 849 F.2d 418, 422-23 (9th Cir.

21   1988) (hypothetical that ultimately serves as the basis for the ALJ's determination must be

22   supported by substantial evidence).  Hypothetical questions posed to a vocational expert must set

23   out all the substantial, supported limitations and restrictions of the particular claimant.

24   *Magallanes*, 881 F.2d at 756.  Here, the ALJ's hypothetical satisfied that requirement.

25   Therefore, plaintiff is not entitled to relief on this ground.

26   ////

26

1    Additionally, although plaintiff argues that the ALJ improperly relied on the VE's

2  testimony since the ALJ did not ask the VE whether there were any conflicts between the

3  occupational evidence he provided and the DOT, the VE's testimony regarding the positions of

4  callout operator, election clerk, and surveillance system monitor was sufficient to sustain the

5  ALJ's findings and was consistent with the information contained in the DOT.  *See* The United

6  States Dept. of Labor, Employment and Training Admin., *Dictionary of Occupational Titles* (4th

7  ed. 1991), 237.367-014, 205.367-030, and 379.367-010.  The ALJ's characterization of

8  plaintiff's RFC accords with the requirements of the positions suggested by the VE.  *See Curry*

9  *v. Sullivan*, 925 F.2d 1127, 1129 (9th Cir. 1990) (harmless error analysis applicable in judicial

10  review of social security cases).  Therefore, plaintiff is not entitled to relief on this ground.

11  V.  CONCLUSION

12    In conclusion, the court finds that the ALJ's decision is supported by substantial evidence

13  in the record and based on the proper legal standards.  Therefore, IT IS ORDERED that:

14    1.  Plaintiff's motion for summary judgment is denied;

15    2.  The Commissioner's cross-motion for summary judgment is granted; and

16    3.  The Clerk is directed to enter judgment in the Commissioner's favor.

17  DATED:  March 31, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE